Joshua P. Davis, SBN 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
T.415.215.0962; F.215.875.4604

Sophia M. Rios, SBN 305801
srios@bm.net
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
T. 619.489.0300

E. Michelle Drake*
emdrake@bm.net
Marika K. O'Connor Grant, SBN 334469
moconnorgrant@bm.net
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999; F. 612.584.4470
*pro hac vice forthcoming

 Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHONNA COLEMAN, on behalf of herself and all others similarly situated,<br><br><br>Plaintiff,<br>v.<br><br>PAYPAL HOLDINGS, INC., a California Corporation, PAYPAL, INC., a California Corporation,<br><br>Defendants. | Case No.:   5:25-cv-367<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shonna Coleman, on behalf of herself and all others similarly situated, alleges as follows:

## INTRODUCTION

1.     Honey is a free browser extension widely used by consumers. The extension allegedly crawls the internet for (a) coupons that can be applied to online purchases, and (b) to confirm that the price that the consumer sees is the best price available.

2.     Honey's purported ability to quickly price check a product before a consumer makes an online purchase is what attracts consumers to the browser extension—it allows them to effortlessly look for a discount on a product that they are already interested in purchasing and have already added to their online shopping cart.

3.     On January 6, 2020, PayPal Holdings, Inc., announced that it acquired Honey Science Corporation for $4 billion—PayPal's largest acquisition to date. PayPal took full control of operations shortly thereafter and rebranded the browser extension as "PayPal Honey" in 2022.

4.     According to PayPal, there are at least 17 million individuals in the United States who use the Honey extension each day.

5.     Content creators, including YouTubers and other online influencers, direct their followers and viewers to specific products and services and earn sales commissions when consumers purchase the products and services that the content creators are promoting.

6.     Online retailers (or "eCommerce merchants") work with these content creators through affiliate marketing programs, which rely on tracking tags and affiliate marketing cookies to determine who gets credit for online referrals and product sales.

7.     The content creator is given a specific web link from the online retailer to share with their audience, and if someone clicks on that link immediately prior to making a purchase, the content creator's unique affiliate marketing cookie auto-populates and credits the content creator with the sale. This is referred to as "last click attribution."

8.     Honey is causing content creators to lose out on commissions to which they are entitled during the online checkout process.

9.     Plaintiff and class members are such content creators.

CLASS ACTION COMPLAINT

10.     PayPal programmed the Honey browser extension to systematically appropriate commissions that belong to Plaintiff and class members. This is done by Honey substituting its own affiliate marketing cookie in place of the content creator's affiliate marketing cookie, even when the online shopper had used the content creator's specific affiliate web link to navigate to the purchase page.

11.     Plaintiff and the class are content creators whose commission payments Honey has wrongfully collected. Plaintiff brings this case on her own behalf and on behalf of all others similarly situated to recover the damages that they have sustained and enjoin Honey's wrongful conduct going forward.

## JURISDICTION

12.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member (including Plaintiff) is of diverse citizenship from PayPal, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

13.     This Court has personal jurisdiction over PayPal because PayPal has its principal headquarters in San Jose, California, does business in California, directly or through agents, and has sufficient minimum contacts with California such that it has intentionally availed itself of the laws of the United States and California.

14.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2), because a substantial number of the events or omissions giving rise to the claims arose in Santa Clara County, where PayPal is headquartered and conducts business.

15.     **Divisional Assignment.** Pursuant to Civ. L.R. 3-2(c), this action should be assigned to the San Jose Division, as the claims arise from events occurring in Santa Clara County.

## PARTIES

A.     **Plaintiff**

16.     Shonna Coleman is a resident of Nebraska.

B.     **Defendants**

- 3 -

CLASS ACTION COMPLAINT

17.    Defendant PayPal Holdings, Inc., is a corporation incorporated in Delaware. It holds all assets and liabilities of Defendant PayPal, Inc., a subsidiary corporation also incorporated in Delaware. When referred to together herein, they are collectively "PayPal." PayPal transacts business and is headquartered within this judicial District, specifically at 2211 North First Street, San Jose, California 95131.

18.    PayPal owns and operates Honey Science Corporation, which originally developed the Honey browser extension. Unless otherwise noted herein, the term "PayPal" includes Honey.

**RELEVANT FACTS**

**A.    Defendants' Methods of Appropriating Commissions**

19.    PayPal persuades consumers to download the Honey browser extension by promising the extension will comb the internet for coupons that can be applied to items that are already in the those consumers' online shopping carts.

20.    The Honey browser extension engages in near-instantaneous web scraping to search for and test coupon codes that might be applicable to the relevant purchase.

21.    With the rise of social media and increasing popularity of platforms like YouTube, eCommerce retailers have turned to content creators (which includes but is not limited to YouTubers, influencers, bloggers, and reviewers) to market their products to consumers.

22.    Content creators make commissions by directing their audience to affiliate links.

23.    Affiliate links are unique hyperlinks that direct consumers to a given website where they can purchase the product or service being promoted by a content creator.

24.    eCommerce merchants use tracking tags to determine whether a consumer landed on the webpage for their product or service and made a purchase after clicking an affiliate link. These retailers can then attribute the sale to the content creator responsible for the affiliate link and provide a commission to that content creator.

25.    PayPal has been using the Honey browser extension to manipulate network transmissions to allow PayPal to surreptitiously take credit for sales commissions that it did not earn.

26.    Honey displaces tracking tags that identify specific content creators as the source of the referral, substitutes its own tracking tags, and holds itself out as the referrer of the specific

products and/or services, even though the sale in question was the direct result of the content creator's affiliate marketing link.

27.     Analysis of network traffic on websites where the Honey extension was running reveals electronic transmissions and communications between a user's browser, the website, and other third parties. Network traffic is typically invisible to ordinary website users.

28.     The network traffic demonstrates that, when an online shopper has downloaded the Honey browser extension, Honey silently and invisibly removes affiliate cookies and tracking tags that would otherwise credit the rightful salesperson—the content creator—with the sale of that particular product or service.

29.     A recent third party investigation used an example from when an online shopper watches a YouTube video and wants to purchase something that the YouTube content creator is promoting.

30.     The online shopper in question would scroll down to the YouTube video description, identify the link for the specific product they want to purchase, and click on the link. At that point, the online shopper is redirected to the merchant website to complete the purchase.

31.     The image below is a screenshot of the network traffic prior to activating the Honey browser extension. The extensions tab shows that Honey has been installed on the shopper's browser but has not yet been activated on that particular page. At this point, the affiliate marketing cookie correctly attributes the referral to "Linus Tech Tips." This means the content creator is getting credit for the referral and may receive a commission.



CLASS ACTION COMPLAINT

32.    However, as demonstrated in the image below, once the Honey extension is activated, the affiliate marketing cookie—which would otherwise credit "Linus Tech Tips" with the sale and affiliate commission—is overwritten and displaced. In other words, PayPal gets credit for the referral and online shopper's ultimate purchase of the product even though it neither recommended the product to the online shopper nor provided the online shopper with any additional discount on the product.



33.    When a consumer clicks on a content creator's affiliate link, a tracking tag is appended to the URL, allowing the eCommerce merchant to know whom to credit with the referral and commission for the sale.

34.    The tracking tag is saved on the consumer's browser in the form of a cookie.

35.    When it comes to online referral commissions from affiliate marketing links, the industry standard used for crediting sales is "last-click attribution," which means that the last "click" determines who gets credit for a sale.

36.    The Honey browser extension is designed to exploit the last-click attribution process in that it purposefully supplants content creators' cookies. The Honey browser extension does this by producing pop-ups that simulate referral clicks—the click that would normally come from clicking on a content creator's affiliate link.

37.     For example, if the consumer clicks the "Apply Discounts" button presented by Honey, shown below as it would appear during checkout, the Honey browser extension will discreetly open a new tab that acts as a simulated referral click. This process removes the content creator's affiliate cookie and replaces it with PayPal's own affiliate cookie.



38.     Honey thus steals credit for sales and pockets commission money it did not earn. Accordingly, PayPal's goal is to convince consumers to activate the Honey extension when making purchases, and this is true even when Honey has not identified any relevant coupons based on the products in the online shopper's cart.

39.     PayPal entices online shoppers to activate the Honey browser extension in several different ways, each of which displaces the referring content creator and claims commission credit for sales that PayPal did not influence, much less generate.

40.     For example, when a consumer clicks a content creator's marketing affiliate link and adds an item to their cart and moves through the checkout process, the Honey extension will present a pop-up alerting the consumer that the extension has identified a coupon, and offers the consumer an "Apply Coupons" button. If the consumer clicks that Apply Coupons button, Honey then seamlessly inserts its own affiliate cookie in the place of the content creator's.

41.     Even if the Honey extension is unable to actually find a coupon to apply, instead of Apply Coupons, at that same stage it still presents a pop-up that requests the consumer click a button to move forward, this time saying something like "You already have the best price," and the button message is "Continue to Checkout." Once again, if the consumer clicks the button on the Honey pop-up, Honey then seamlessly inserts its own affiliate cookie in the place of the content creator's.

CLASS ACTION COMPLAINT

42.    Additionally, again in a scenario where Honey did not find any coupons or discounts, sometimes Honey's pop-up will present with the option for the consumer to click PayPal's checkout button, as opposed to the online retailer's, using language such as "Get Rewarded with PayPal." Again, if the consumer clicks the button in Honey's pop-up, Honey then seamlessly inserts its own affiliate cookie in the place of the content creator's.

43.    **"**Honey Gold" is an additional program that PayPal uses to misappropriate content creators' commissions. Honey Gold offers reward points to Honey users, which can be redeemed for gift cards to stores like Target. Under this program, the Honey browser extension presents the consumer with the same type of pop-ups detailed above, but also includes language stating the online shopper will earn Honey Gold points for their purchase regardless of whether there is a viable coupon code. Once again, when the consumer clicks on Honey's pop-up, it triggers a process that attributes the sales commission to PayPal instead of the content creator.

44.    Through these avenues, PayPal uses the Honey browser extension to wrongfully take commissions from content creators.

45.    PayPal even recruits unsuspecting content creators to promote the Honey browser extension to their audiences. Now it is these same content creators—along with many others—from whom PayPal is stealing commissions.

**B.    Plaintiff's Experience**

46.    Shonna Coleman is an influencer and content creator who earns commission payments from affiliate marketing links she shares on social media, including Facebook (see, e.g., https://www.facebook.com/share/p/1HYMCVzoAc/, https://www.facebook.com/share/p/15XvJdJwmY/, https://www.facebook.com/share/p/194HujNaX9/)    and    X    (formerly    known    as    Twitter) (@shonnacoleman).

47.    In past years, Ms. Coleman has received substantial commission payments from products purchased via her affiliate marketing links.

48.    Ms. Coleman would have earned more income in the form of commission payments but for PayPal's scheme to usurp commissions through the Honey browser extension.

49.    PayPal, via the Honey browser extension, stole credit for sales and conversions that Ms. Coleman originated via her own platforms, emanating from the affiliate marketing links she shared on those platforms.

**C.    How Class Members Were Harmed**

50.    PayPal's conduct harmed Plaintiff and the Class because the Honey browser extension systematically steals commission payments from the rightful owners—*i.e.*, the individual who promoted and shared the affiliate link and generated the referral and ultimate sale of a product or service.

51.    Plaintiff promotes products via her social media channels and hosts affiliate marketing links to those products. She has several marketing affiliate links with Amazon.

52.    When one of Ms. Coleman's followers clicks on her affiliate marketing link and adds the product to their online shopping cart, her referral tag and cookie attaches and attributes the referral and sale of the product to Ms. Coleman, thereby crediting her with the sale and corresponding commission payment.

53.    However, if the user activates the Honey browser extension during the checkout, Honey wrongfully removes Ms. Coleman's affiliate cookie and replaces it with Honey/PayPal's own affiliate cookies, stealing credit for the referral and corresponding commission payment for that particular product.

54.    Ms. Coleman spends a substantial amount of time and money cultivating her follower-base and promoting the products featured in her affiliate marketing links.

55.    She relies on the stream of income she generates through her work as a content creator.

56.    The Honey browser extension is activated during millions of online purchases each year. In the absence of the Honey browser extension, Plaintiff and the Class would have earned more money in the form of referral fees and sales commissions from their respective affiliate marketing links.

57.    Plaintiff continues to devote time and energy to content creation to generate commissions.  Plaintiff accordingly faces future harm in the form of misappropriated referral fees

and sales commissions because PayPal's Honey browser extension continues to steal affiliate marketing commissions to this day.

## CLASS ALLEGATIONS

58.    Plaintiff, on behalf of herself and the class defined below under the Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), seeks damages and injunctive relief:

> **Nationwide Class:** All persons in the United States who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to PayPal as a result of the Honey browser extension.

> **Nebraska Subclass:** All persons in Nebraska who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to PayPal as a result of the Honey browser extension.

> (together, "the Class").

59.    Excluded from the Class are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

60.    **Numerosity:** Members of the Class are so numerous that joinder is impracticable. There are at least tens of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least thousands of members of the Subclass, such that joinder of all Subclass members is likewise impracticable.

61.    **Typicality:** Plaintiff's claims are typical of the claims of the other class members. The factual and legal bases of PayPal's liability are the same and resulted in same type of injury to Plaintiff and all other members of the Class.

62.    **Adequate representation:** Plaintiff will represent and protect the interests of the Class both fairly and adequately. She has retained counsel competent and experienced in complex class action litigation. Plaintiff has no interests that are antagonistic to those of the Class, and her interests do not conflict with the interests of the class members shehey seek to represent.

CLASS ACTION COMPLAINT

63. **Commonality and Predominance:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because PayPal has acted on grounds generally applicable to the Class and because class members share a common injury. Common facts and legal questions apply to the claims of Plaintiff and class members because the injuries incurred by Plaintiff and each member of the Class arose from the same conduct alleged herein.

64. There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

    a. Whether PayPal programmed and designed the Honey browser extension in a manner that wrongfully credits PayPal as the originator of sales referrals;

    b. Whether the scheme described herein results in PayPal being awarded commission payments it did not rightfully earn;

    c. Whether PayPal was unjustly enriched to the detriment of Plaintiff and the Class in the form of commission payments;

    d. Whether PayPal, through the actions alleged in this complaint, violated consumer protection laws in the state of California;

    e. Whether consumers and class members have been damaged by PayPal's conduct; and

    f. The nature and scope of appropriate injunctive relief.

65. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

CLASS ACTION COMPLAINT

66.     Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for PayPal;

- The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

- PayPal has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of class members consist of common issues whose resolution in a class trial would materially advance this litigation.

## TOLLING OF THE STATUTES OF LIMITATIONS

67.     All applicable statute(s) of limitations have been tolled by PayPal's knowing and active concealment and denial of the facts alleged herein. Plaintiff and class members could not have reasonably discovered PayPal's practice of surreptitiously manipulating network transmissions to allow Honey to take credit for sales commissions it did not earn.

68.     PayPal was and remains under a continuing duty to disclose to Plaintiff and class members its practice of displacing content creators' tracking tags with its own tracking tags to appropriate commissions that belong to Plaintiff and class members. The active concealment by PayPal tolls any and all applicable statutes of limitations otherwise applicable to the allegations herein.

CLASS ACTION COMPLAINT

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**UNJUST ENRICHMENT**
**(ON BEHALF OF THE CLASS)**

69.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

70.    Plaintiff lacks an adequate remedy at law.

71.    Plaintiff and class members have an interest, both equitable and legal, in the referral fees and commission payments to which they were wrongfully deprived. These payments were rightfully earned by Plaintiff and class members, not PayPal.

72.    PayPal benefitted from the referral fees and commission payments that were credited to it as a function of the Honey browser extension wrongfully claiming credit via last-click attribution.

73.    PayPal understood that it so benefitted, and it also understood and appreciated that the Honey browser extension would cause the harm described herein.

74.    But for PayPal's unjust and improper use of the Honey browser extension, it would not have been credited and awarded commission on sales that emanated from Plaintiff's and class members' respective affiliate marketing links.

75.    As a result of PayPal's wrongful conduct as alleged in this Complaint, PayPal has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and class members.

76.    PayPal continues to benefit and profit from the Honey browser extension while Plaintiff and class members continue to have their rightful commission payments diverted to PayPal.

77.    PayPal's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including by using the Honey browser extension to wrongfully credit itself with referrals and commissions it did not rightfully earn.

78.    The benefit conferred upon, received, and enjoyed by PayPal was not conferred officiously or gratuitously, and it would be inequitable and unjust for PayPal to retain the benefit.

79.    Equity and good conscience militate against permitting PayPal to retain the profits and benefits from its wrongful conduct, which should be restored to Plaintiff and class members.

**SECOND CAUSE OF ACTION**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***
**(ON BEHALF OF THE CLASS)**

80.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

81.    Plaintiff lacks an adequate remedy at law.

82.    California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq.*

83.    PayPal has engaged in acts and practices that are unlawful and unfair in violation of the UCL.

84.    PayPal is a "person" as defined by Cal. Bus. & Prof. Code §17201.

85.    PayPal's business acts and practices are unlawful because they interfere with the prospective economic advantage of content creators and constitute conversion, as set forth below. They also have unjustly enriched PayPal for the reasons stated above.

86.    PayPal committed unfair business practices by using the Honey browser extension to steal credit for sales referrals and thereby receive commission payments that rightfully belong to Plaintiff and the California Subclass.

87.    PayPal's conduct is unfair in violation of the UCL because it violates California's public policy against interfering with another's prospective economic advantage.

88.    PayPal wrongfully deprives Plaintiff and the Class of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

89.    The gravity of harm resulting from PayPal's practice of appropriating commissions that belong to content creators like Plaintiff and the Class outweighs any potential utility therefrom. PayPal's conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

90.    PayPal actually and proximately caused harm to Plaintiff and the Class in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

91.    The conduct alleged herein is continuing and there is no indication that PayPal will cease such activity in the future.

92.    PayPal's conduct in violation of the UCL has caused Plaintiff and the Class to be deprived of referral fees and commission payments for sales they rightfully originated. Plaintiff and the Class thus suffered lost money or property as a result of PayPal's conduct.

93.    Plaintiff therefore seeks restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

**THIRD CAUSE OF ACTION**
**INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(ON BEHALF OF THE CLASS)**

94.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

95.    Plaintiff and class members are engaged in an economic relationship with eCommerce merchants by referring their audiences to those merchants through affiliate links. In return, eCommerce merchants provide Plaintiff and class members with referral fees or commissions. This economic relationship is ongoing, and Plaintiff and class members expect to continue earning commissions in exchange for referrals.

96.    PayPal is aware of the referral and commission relationship between Plaintiff and class members on the one hand and eCommerce merchants on the other hand.

97.    Through use of the Honey browser extension, PayPal diverts commission payments from Plaintiff and class members who promoted and shared an affiliate link and generated the referral and ultimate sale of an eCommerce merchant's product or service. PayPal, via the Honey browser extension, displaces tracking tags that point to specific content creators as the source of the referral, and substitutes its own tracking tags, even though the sales in question emanated from a content creator's affiliate marketing link.

98.    PayPal either intended to usurp commissions from Plaintiff and class members through the conduct alleged herein or knew that its conduct would appropriate commissions and referral fees from Plaintiff and class members.

CLASS ACTION COMPLAINT

99.    PayPal's conduct harmed Plaintiff and class members because the Honey browser extension deprived them of monies they earned as the true originators of sales arising from their affiliate marketing links.

100.    As a direct and proximate result of PayPal's conduct described in this Complaint, Plaintiff and class members suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

101.    As a result of the above conduct, PayPal is liable to Plaintiff and class members for damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**CONVERSION**
**(ON BEHALF OF THE CLASS)**

102.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

103.    Plaintiff and class members possessed or had a right to possess commissions they earned from referring consumers to products and services sold by eCommerce merchants. The amount of each commission constituted a specific and identifiable sum.

104.    PayPal intentionally and substantially interfered with Plaintiff's and class members' personal property by usurping commissions and referral fees owed to Plaintiff and class members.

105.    PayPal, without proper authorization, assumed and exercised the right of ownership over these commissions, in hostility to the rights of Plaintiff and class members, without justification.

106.    PayPal's wrongful exercise of control over Plaintiff's and class members' personal property constitutes conversion.

107.    Plaintiff and class members neither assented to nor ratified PayPal's interference with their commissions.

108.    As a direct and proximate result of PayPal's conversion, Plaintiff and class members were harmed.

109.    PayPal is liable to Plaintiff and the Class for damages and costs permitted by law.

CLASS ACTION COMPLAINT

**FIFTH CAUSE OF ACTION**
**VIOLATION OF NEBRASKA'S UNIFORM DECEPTIVE**
**TRADE PRACTICES ACT (UDTPA)**
**NEB. REV. STAT. §§ 87-301, ET. SEQ.**
**(ON BEHALF OF THE NEBRASKA SUBCLASS)**

110.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

111.    Nebraska's UDPTA makes it unlawful to engage in deceptive trade practices.

112.    PayPal violated Nebraska's UDPTA through its conduct as alleged herein. In particular, PayPal's conduct constitutes a violation of Sections 87-302(a)(2), (a)(3), (a)(5), (a)(6), (a)(12), and (a)(16).

113.    PayPal is liable to Plaintiff and the Class for damages, costs and injunctive relief as permitted by law.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF NEBRASKA CONSUMER PROTECTION ACT (NCPA)**
**NEB. REV. STAT. §§ 59-1602, ET. SEQ.**
**(ON BEHALF OF THE NEBRASKA SUBCLASS)**

114.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

115.    The NCPA provides, in relevant part, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

116.    PayPal violated the NCPA through its conduct as alleged herein.

117.    PayPal's conduct affected the public interest because it was widespread. Affiliate marketing links are ubiquitous, as is Honey.

118.    PayPal is liable to Plaintiff and the Class for damages, costs, and injunctive relief as permitted by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

A.    Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

B.    Enter judgment in favor of Plaintiff and the Class;

C.      Enter injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class, including to prevent the Honey browser extension from taking credit for sales it did not originate;

D.      Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and restitution to which Plaintiff and the Class are entitled;

E.      Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F.      Award Plaintiff and the Class pre- and post-judgment interest as provided by law;

G.      Enter such other orders as may be necessary to restore to Plaintiff and the Class any money and property acquired by PayPal through its wrongful conduct;

H.      Award Plaintiff and the Class reasonable litigation expenses and attorneys' fees as permitted by law; and

I.      Award such other and further relief as the Court deems necessary and appropriate.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues triable as of right.

DATED: January 10, 2025               Respectfully submitted,

By: /s/*Joshua P. Davis*
Joshua P. Davis, SBN 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
T.415.215.0962; F.215.875.4604

Sophia M. Rios, SBN 305801
srios@bm.net
BERGER MONTAGUE PC
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
T. 619.489.0300

E. Michelle Drake*

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

emdrake@bm.net
Marika K. O'Connor Grant, SBN 334469
moconnorgrant@bm.net
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999; F. 612.584.4470
*pro hac vice forthcoming*

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT